EQUITY TRUST COMPANY CUSTODIAN FBO Heather EISENMENGER IRA, et al., Respondents,

v.

Joseph A. COLE, Defendant,

Jim W. Abbott, Defendant,

Geoff and Nancy Thompson, Appellants,

Progressive Home Services, Inc., d/b/a Investment Properties of Minnesota, et al., Defendants, and etc. (Other case captions as listed in the Consolidation).

No. A08–1681.

Court of Appeals of Minnesota.

June 9, 2009.

Robert B. Bauer, Jessica L. Sanborn, Thomas R. Donely, Severson, Sheldon, Dougherty & Molenda, P.A., Apple Valley, for respondents.

Kathryn J. Bergstrom, Prairie Bly, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for respondent/receiver Cordes & Company.

Christopher P. Parrington, Benjamin R. Skjold, Skjold–Barthel, P.A., Minneapolis, for appellant.

Considered and decided by
STONEBURNER, Presiding Judge;
BJORKMAN, Judge; and
MUEHLBERG, Judge.

## O P I N I O N

MUEHLBERG, Judge.*

This is an appeal from a decision to pierce the corporate veils of several entities allegedly involved in a consumer-fraud scheme. The district court imposed personal liability against appellants Geoff and Nancy Thompson and their business partners for the default judgment entered against the entities. The Thompsons contend that the district court abused its discretion by holding them personally liable because they were not shareholders or members of the entities. The Thompsons also claim that the district court (a) abused its discretion in administering the receiver-

ship; and (b) erred by denying their motions for summary judgment. We affirm.

## FACTS

This appeal arises out of eight consolidated lawsuits involving a large-scale real estate investment fraud scheme allegedly orchestrated by appellants Geoff and Nancy Thompson and their business partners, James Abbott and Joseph Cole (collectively referred to as "the principals"). According to respondent investors, the scheme involved the sale of memberships in a real estate investment program called an "AMP Plan." Investors were enticed to become AMP Plan members by the promise of exclusive, member-only investment opportunities. To become a member, investors were required to enter into an "AMP Plan Membership Agreement" and pay a membership fee to Progressive Home Services, Inc., d/b/a Investment Properties of Minnesota or IPM Realty ("IPM"). Memberships were advertised through "seminars, phone conversations, email communication and direct solicitation."

Two basic types of investment opportunities were offered to prospective members over the course of the scheme. Some investors were offered interests in condominium projects in (1) the Mayfair House Hotel in Miami (Kinney I lawsuit); (2) the Seminole Bay, Kings Pointe, and Apollo Bay developments in Florida (Ahmann lawsuit); or (3) the Hotel 71 project in Chicago (Kinney II lawsuit). Investors were told that the properties were appreciating rapidly, with the potential for lucrative returns. The purchase terms and conditions varied; however, as part of each transaction, members entered into purchase agreements and deposited earnest money with, or paid other up-front fees to,

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

corporate entities allegedly owned or managed by the principals. The transactions proved to be fraudulent, as none of the purchases were ever completed, and investors' earnest money and other fees were not returned.

Other investors were invited to participate in a "Private Loan Program" administered by corporate entities allegedly owned or managed by the principals. The program allowed members to loan money to IPM for real estate development projects in exchange for a 30 to 35% rate of return (Sober lawsuit). Each member was given a promissory note that included the material terms of the agreement. As part of the agreement, members were entitled to "call" the note (have their money returned) "at any time for any reason," and IPM was also required to purchase an insurance policy that would insure the members' investments for up to $25 million. Investors loaned approximately $3.5 million to IPM as part of the program. But, like the condo unit investment offers, the private loan program was a sham. None of the loaned funds were used for real estate development, and each loan eventually went into default and remains unpaid. In addition, the insurance policy that was supposed to protect the investments was never obtained.

In August 2006, approximately 178 investors collectively brought eight lawsuits [1] against the principals and a myriad of corporate entities involved in the scheme, including IPM, National Real Estate Assignments, LLC d/b/a America National Assignments (NREA), Investment Properties of America, Inc. (IPA), Amerifunding Group, LLC, and J & J Investment Properties of Minnesota, LLC (J & J). The suits included claims for breach of fiduciary duty, breach of contract, intentional and negligent misrepresentation, conspiracy, accounting, civil theft, and violations of the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70 (2006), the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. §§ 325D.43–.48 (2006), the Minnesota Regulation of Securities Act, Minn.Stat. §§ 80A.01–.31 (2006),[2] Minn.Stat. § 82.50 (2006), Minn. Stat. §§ 83.23–.24 (2006), and Illinois and Florida laws pertaining to real estate registration and disclosures. The investors also alleged that the various corporate entities involved in the schemes were "alter egos" of the principals.

In September 2006, the state intervened in the Sober lawsuit pursuant to Minn. R. Civ. P. 24.01, alleging that the principals and their various corporate entities had violated the Minnesota statutes on the prevention of consumer fraud and regulation of securities. The state also sought to temporarily enjoin the principals and corporate entities from continuing their unlawful activities and the appointment of a receiver to identify and attach all nonexempt assets held by the parties involved in the fraud.

In October 2006, the district court granted the state's motion for a temporary injunction against Abbott and Cole and appointed respondent Cordes and Company, LLC, to act as receiver for the property of IPM, J & J, and Amerifunding Group. Approximately one month later, the district court consolidated the eight suits.

---

**1.** Because the lawsuits contain the same or similar allegations, for purposes of simplicity and clarity, we limit our discussion to the claims contained in the Ahmann, Kinney I, Kinney II, and Sober complaints.

**2.** This act was repealed in 2006 and recodified at Minn.Stat. § 80A.40–.90 (effective Aug. 1, 2007).

In January 2007, the state moved to dismiss its complaint in intervention, claiming it was no longer a necessary party to the action because it had fulfilled its obligation to protect the public interest by obtaining injunctions against participants in the scheme and securing the appointment of a receiver. The district court granted the motion. After dismissing the state's complaint in intervention, the district court granted the receiver's motion and expanded the receivership to include authority over three additional corporate entities that allegedly served as conduits for other receivership entities formed by the principals. The court also ordered the Thompsons' attorneys to relinquish $750,000 in proceeds allegedly belonging to one of the entities.

The Thompsons subsequently moved to dismiss for failure to state a claim under Minn. R. Civ. P. 12.02(e). The district court denied the motion, concluding that each of the counts alleged in the complaints set forth a legally sufficient claim for relief.

After participating in discovery, the investors moved for summary judgment against the principals and default judgment against IPM, NREA, IPA, Amerifunding Group, and J & J Investments, which had failed to answer the complaints. The investors also requested that the district court pierce the corporate veil of each corporate entity to hold the Thompsons personally responsible because the entities were their alter egos. The Thompsons filed a cross-motion for summary judgment, claiming that the investors had failed to produce any evidence to support their personal liability for the claims alleged in the complaints and asserting that they could not be held liable under a veil-piercing theory because they were not identified as shareholders or members in official corporate documents filed with the state.

The district court denied both summary judgment motions, but granted default judgment against the corporate entities. The district court also granted the request to pierce the corporate veil of each entity to hold the Thompsons personally responsible for the default judgment against the corporations under the "alter ego" theory. In piercing the corporate veils, the district court rejected the argument that the Thompsons could only be held liable for the acts of the entities if they were listed as shareholders or members in corporate documents. The district court found that piercing was appropriate because the Thompsons were "listed as owners and/or officers on certain documents" and because there was "substantial evidence that [the Thompsons] held themselves out as putative owners and/or officers in communications with clients and other ... employees [of the corporate entities]."

The investors later requested that the district court pierce the corporate veil against Abbott and Cole and enter judgment against all of the principals personally for the earlier default judgment order issued against the corporate entities. The district court granted the motion and entered judgment against the principals for $22.68 million, the total amount of damages allegedly caused by the real estate investment scheme. This appeal by the Thompsons followed.

## ISSUES

I. Did the district court abuse its discretion by piercing the corporate veil to hold the Thompsons personally liable?

II. Did the district court abuse its discretion by granting the receiver's motion to expand the receivership?

III. Did the district court err by denying the Thompsons' summary judgment motion?

## ANALYSIS

### I.

■ Piercing the corporate veil is an equitable remedy that may be applied in order to avoid an injustice. *Roepke v. W. Nat'l Mut. Ins. Co.*, 302 N.W.2d 350, 352 (Minn.1981). A district court's exercise of its equitable powers is reviewed for an abuse of discretion. *Edin v. Jostens, Inc.*, 343 N.W.2d 691, 693 (Minn.App.1984). The factual findings made in support of the decision to pierce are reviewed for clear error on appeal. *See* Minn. R. Civ. P. 52.01.

■ A court may pierce the corporate veil to hold a party liable for the acts of a corporate entity if the entity is used for a fraudulent purpose or the party is the alter ego of the entity. Minn.Stat. § 322B.303, subd. 2 (2006) (stating that veil piercing also applies to limited liability companies); *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979). "When using the alter ego theory to pierce the corporate veil, courts look to the reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *Hoyt Properties, Inc. v. Prod. Res. Group, L.L.C.*, 736 N.W.2d 313, 318 (Minn.2007) (quotation omitted). Several factors are relevant to the inquiry, including:

> insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate rec-

ords, and existence of corporation as merely facade for individual dealings. *Victoria Elevator*, 283 N.W.2d at 512. If the corporation or limited liability company is found to be an "alter ego" or mere "instrumentality," a court may pierce the corporate veil if there is an "element of injustice or fundamental unfairness." *Id.*

■ The Thompsons do not dispute that many of the alter-ego factors are present. Instead, they claim that the district court abused its discretion in holding them personally liable because they are not shareholders or members of the entities.

■ We disagree. As discussed below, much of the evidence suggests that the Thompsons did maintain an ownership interest in the entities. But whether a party holds an ownership interest in the entity is not dispositive. Veil piercing is an equitable remedy, and courts are to consider "reality and not form" in determining a party's involvement in a corporate enterprise. *Hoyt Properties*, 736 N.W.2d at 318. If veil piercing were solely dependent on a party's ownership interest in an entity, unscrupulous parties could avoid personal liability under the doctrine by simply acting in a capacity that does not involve ownership. *Cf. State v. Strimling*, 265 N.W.2d 423, 430–31 (Minn.1978) (stating as part of an analysis of criminal liability for diversion of corporate funds that "[i]n the realm of closely held corporations, the role of the silent strong man is a familiar one," and it would be "ill-advised" to allow such a person "to insulate himself from liability ... merely by making certain that he is not formally designated as an official of the corporation whose property he wishes to divert"). Because veil piercing is grounded in equity and intended to prevent abuse of corporate protections, we hold that a district court may pierce the corporate veil to impose personal liability against any party who disre-

gards the corporate form, regardless of whether the party holds an ownership interest in the entity.

Here, the investors presented substantial evidence that the Thompsons were personally involved in the ownership, management, and operation of the entities. For example, Cole testified at his deposition that the corporate entities were not distinct, but part of a single operation collectively owned and managed in equal parts by the principals pursuant to an oral agreement. Cole claimed that he and Abbott were partners in several real estate investment companies, including IPM and J & J, but they had limited business experience and became overwhelmed as the companies began to grow. They eventually chose to partner with the Thompsons, who owned real estate investment companies and had extensive experience in the mortgage and title industries. During a spring 2006 meeting, the principals agreed to "pool all the companies together and form one entity," to be named IPA. Although he was unsure whether their ownership agreement was ever reduced to writing, Cole claimed that the principals agreed that Cole and Abbott would each receive a one-third interest in the conglomeration of entities, with the Thompsons sharing the other third. According to Cole, the Thompsons were also treated as officers or directors of the entities with equal authority to act on behalf of the entities. Internal corporate memos and letters from the Thompsons to investors corroborate Cole's testimony that the Thompsons were actively involved in managing the entities and marketing the investment schemes.

The evidence also supports the district court's finding that the principals were the alter egos of the entities. Cole admitted that he had no recollection of the principals observing corporate formalities and could not remember what J & J did as a company. Cole further acknowledged that at least one of the entities was capitalized for as little as $200. Two of the entities were also operated out of the same office, with employees for one of the entities permitted access to the corporate documents of the other. Also significant is the fact that the entities were not financially independent. Accounting services rendered to one entity were invoiced to another entity, and a statement for legal services performed on behalf of many of the veil-pierced entities was sent to Nancy Thompson at IPA. Moreover, wire-transfer receipts and financial statements obtained by the investors demonstrate that money was transferred between entities and withdrawn from them in large sums by the Thompsons. A negative inference can also be drawn from the Thompsons' decision to invoke their Fifth Amendment right to avoid self-incrimination. *See Crockarell v. Crockarell*, 631 N.W.2d 829, 833–34 (Minn. App.2001) (holding that, although witness may invoke right against self-incrimination in civil proceeding, district court may make negative inferences from invocation of right), *review denied* (Minn. Oct. 16, 2001). Based on the totality of the evidence, we conclude that the first prong of the *Victoria Elevator* test is satisfied.

■■■ The second prong of the test requires a showing that piercing of the corporate veil is necessary to avoid injustice or fundamental unfairness. *Victoria Elevator*, 283 N.W.2d at 512. "[P]roof of strict common law fraud is not required, but . . . evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented." *Groves v. Dakota Printing Servs., Inc.*, 371 N.W.2d 59, 62–63 (Minn.App. 1985). Considering that the entities were operated in furtherance of a large-scale

real estate fraud scheme, this prong is easily satisfied.

Due to the nature of the Thompsons' involvement with the entities, and the presence of numerous, uncontested alter-ego factors, we conclude that the district court did not abuse its discretion in piercing the corporate veil to hold the Thompsons responsible for the judgments against the corporations.

## II.

 The Thompsons raise several issues with respect to the district court's administration of the receivership. They argue that the district court abused its discretion by (1) expanding the receivership to include North Fort Meyers, LLC, North Fort Holdings, LLC, and Roseville Arms Condominiums, LLC; (2) requiring them to turn over $750,000 in their attorneys' possession to the receiver because it allegedly belonged to North Fort Meyers; and (3) failing to require the receiver to post a bond.

### 1. Expansion of the receivership

 On appeal, the expansion of a receivership is reviewed for an abuse of discretion. *Cf. Minn. Hotel Co. v. ROSA Dev. Co.*, 495 N.W.2d 888, 891 (Minn.App. 1993) (stating that the appointment of a receiver is reviewed for an abuse of discretion). In reviewing the decision, this court must consider the facts supporting the decision in the light most favorable to the prevailing party in the receivership dispute. *See Bliss v. Griswold*, 222 Minn. 494, 502–03, 25 N.W.2d 302, 307–08 (1946).

The Thompsons claim that the receivership could not be expanded because the receiver was originally appointed pursuant to Minn.Stat. § 8.31, subd. 3c (2006). The statute permits a court to appoint an administrator in actions brought by the attorney general. Minn.Stat. § 8.31, subd.

3c. Because the state was no longer a party at the time the receivership was expanded, the Thompsons contend that the district court had no authority under the statute. But this argument misconstrues the district court's original receivership order. Appointment of the receiver was not conditioned upon Minn.Stat. § 8.31. Instead, the receiver was appointed pursuant to Minn.Stat. § 576.01 (2006), the general statutory provision for appointment of a receiver, as well as the court's general equitable powers.

 The Thompsons further argue that the receiver had no standing to pursue expansion of the receivership because it was not a party to the lawsuits. A receiver is generally not considered a "party" to a lawsuit. The role of a receiver is to act as a fiduciary representing the court and all parties in interest, and the purpose and scope of a receivership is defined by court order. *Shadewald v. White*, 74 Minn. 208, 208, 77 N.W. 42, 42 (1898) (stating that "a receiver occupies a fiduciary relation, and is trustee for all parties interested in the property [e]ntrusted to his charge by the court"); *see also In re Telesports Prod., Inc.*, 476 N.W.2d 798, 800 (Minn.App.1991) ("A receiver is a representative of the court."); *Hancock–Nelson Mercantile v. Weisman*, 340 N.W.2d 866, 869 (Minn.App.1983) (stating that "a receiver's powers are defined by the orders of the court and include authority as may reasonably or necessarily be implied for such orders"). Here, the district court's order permitted the receiver to request supplementation or amendment of the receivership order. Therefore, the receiver acted within its defined authority by requesting an expansion of the receivership.

 Next, the Thompsons contend that the receiver was required to satisfy the conditions set forth in Minn.Stat. § 576.01

in order to expand the receivership. But establishing the statutory requirements under section 576.01 is not a prerequisite to expanding a receivership. A district court may also expand a receivership under its general equity powers. *Cf. Minn. Hotel Co.*, 495 N.W.2d at 893 (providing that a district court may appoint a receiver under its general equity powers). Here, the expansion of the receivership was based in part on the district court's equitable powers. Accordingly, no statutory findings were necessary.

The Thompsons also claim that the receiver had no authority to pursue funds from North Fort Meyers because the receiver was only appointed in the Sober lawsuit and the funds held by North Fort Meyers were implicated in the Seminole Bay project, which was one of the bases for the Ahmann lawsuit. But this argument ignores the receiver's purpose for moving to expand the receivership. The receiver alleged that some of the funds used by North Fort Meyers to purchase the Seminole Bay project had been received from one or more of the entities identified in the original receivership order, which included entities that were implicated in the Sober lawsuit. Moreover, nothing in the receivership order limits the receiver's investigation to entities involved in the Sober lawsuit. The receiver was merely performing its duty to identify, locate, and seize the assets of receivership entities "wherever [they] may be found."

### 2. Attachment of funds in Thompsons' possession

The Thompsons further argue that the district court should have required the receiver to initiate a lawsuit against them and establish the requirements for injunctive relief before seeking attachment of the $750,000 in their possession. We see no merit in this argument because the receiver's purpose in seeking attachment of the funds was not to pursue judgment against the Thompsons, but to gather property covered under the receivership order. In addition, the Thompsons did not present any evidence to demonstrate that the funds belonged to them.

### 3. Receivership bond

Finally, the Thompsons contend that the receiver should have been required to post a bond as a condition of its appointment as receiver. But this argument overlooks the fact that the receiver *did* post a bond with the court. Furthermore, this court has previously indicated that a receiver need not post a bond to indemnify parties against wrongful appointment. *Minn. Hotel Co.*, 495 N.W.2d at 893; *see also Griggs, Cooper & Co. v. Lauer's, Inc.*, 264 Minn. 338, 342, 119 N.W.2d 850, 853 (1962) (indicating that receivership bonds are only necessary when required by statute).

### III.

The Thompsons argue that the district court erred in denying their motion for summary judgment on the claims that were brought against them in their personal capacities. But because a final judgment has not been entered with respect to those claims, they are not reviewable on appeal. *See* Minn. R. Civ.App. P. 103.03 (stating that the denial of summary judgment is generally not a final judgment from which an appeal may be taken). Therefore, we decline to consider this argument.

### DECISION

Because the evidence in the record supports the finding that the Thompsons disregarded the corporate form in their involvement with the entities, the district court did not abuse its discretion in (1) piercing the corporate veil to hold the

Thompsons personally responsible for the damages arising out of the default judgment; and (2) granting the receiver's motion to expand the receivership.

**Affirmed.**