*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0378
A15-1863
A15-1864**

Curtis Trude, et al.,
Appellants (A15-0378),
Plaintiffs (A15-1863, A15-1864),

Glenwood State Bank,
defendant, counterclaimant, and third party plaintiff,
Respondent,

vs.

Peterson Earth Movers, Inc., et al.,
Third Party Defendants (A15-0378, A15-1863),
Appellants (A15-1864),

Golden West, LLC, et al.,
third party defendants,
Appellants (A15-1863),
Respondents (A15-0378, A15-1864),

Charles D. Peterson,
Third Party Defendant (A15-1864),

and

Curtis Trude, et al.,
Plaintiffs,

vs.

Excel Recovery, Inc., et al.,
Defendants.

**Filed August 15, 2016**

Meeker County District Court
File No. 47-CV-12-176

John E. Mack, Mack & Daby, P.A., New London, Minnesota (for appellants Curtis Trude, et al.)

Jack Atnip, III, Matthew J. Bialick, Helmuth & Johnson, PLLC, Edina, Minnesota (for respondent Glenwood State Bank)

Kay Nord Hunt, Lommen Abdo, PA, Minneapolis, Minnesota; and

Brian M. Olsen, Cokato, Minnesota (for respondent Golden West, LLC)

Lawrence H. Crosby, Crosby & Associates, St. Paul, Minnesota (for appellants LaVern Peterson and Peterson Earth Movers, Inc.)

Considered and decided by Johnson, Presiding Judge; Ross, Judge; and Stauber, Judge.

## UNPUBLISHED OPINION

**ROSS**, Judge

These consolidated cases come before us on appeal after years of litigation primarily between Glenwood State Bank and Peterson Earth Movers Inc. (PEM), PEM's principal LaVern "Bud" Peterson, JBI LLC, JBI's principal Curtis Trude, and Golden West LLC, and Golden West's principal LaDon Peterson. The instigating transaction was a defaulted loan from Glenwood to PEM guaranteed by Bud. PEM and Bud confessed to the default in 2010, and Glenwood obtained a judgment against them. But when the bank tried to repossess PEM's earthmoving equipment and other property in 2011, Trude and his company JBI sued Glenwood claiming that JBI and Trude owned the property, not PEM.

2

The bank filed a counterclaim against JBI and Trude, alleging several common law causes of action and that JBI acquired PEM's equipment fraudulently in violation of the Minnesota Uniform Fraudulent Transfer Act (MUFTA). The bank also filed a third-party complaint against PEM and Bud, and against Bud's brother LaDon and his company, Golden West LLC, alleging that they assisted and conspired in hiding PEM's assets from the bank. The district court entered a default judgment against JBI and Trude for repeated discovery violations. PEM and Bud became subject to a default judgment after they failed to answer and avoided direct involvement with the litigation, but in March 2015 they moved for relief from the judgment. The district court tried Golden West and LaDon's claims in a bench trial, and it found in Glenwood's favor and held Golden West and LaDon liable for the initial judgment plus attorneys' fees, costs, and interest. All third-party defendants appeal. We affirm.

## FACTS

From 2007 to 2009, Glenwood State Bank issued several loans to Peterson Earth Movers Inc. (PEM) and LaVern "Bud" Peterson, PEM's sole owner. In December 2009, Glenwood made a $494,395 loan to PEM personally guaranteed by Bud and secured by PEM's business property, including accounts payable, inventory, equipment, vehicles, and tools. Bud and PEM defaulted on the loan and signed a confession of judgment in favor of Glenwood. In July 2011, Glenwood filed the confession of judgment in district court and obtained a judgment for $684,618.51, consisting of $494,395.61 in loan principal, $100,660.32 in loan interest, and $89,562.58 in attorneys' fees and collection costs. The

3

judgment also required PEM to pay any future collection costs and attorneys' fees that Glenwood incurs to collect on the judgment.

The district court authorized Glenwood to repossess collateral that PEM held at its headquarters in Litchfield, Minnesota. Glenwood engaged Excel Recovery and its owner Jeremy Runyon to seize the collateral, and Excel Recovery seized equipment and other things. After Glenwood took possession of the property, Curtis Trude (who previously served as PEM's business manager) and his solely owned company JBI LLC filed a complaint against Glenwood, Excel Recovery, and Runyon, alleging that the seized property belonged to Trude and JBI.

Glenwood answered, denying that JBI and Trude owned the property and asserting that they were improperly claiming ownership through JBI's merely leasing office space at PEM's headquarters. Glenwood filed a counterclaim against JBI and Trude, and it also filed a third-party complaint against PEM and Bud, Golden West LLC (a Utah-based company owned by Bud's brother, LaDon Peterson), LaDon Peterson, and Charles Peterson (PEM's former owner and Bud and LaDon's father). Glenwood's third-party complaint and counterclaim alleged that PEM transferred assets to JBI to continue PEM's earthmoving business and escape liability to Glenwood, making JBI a successor in interest to PEM. The complaint also alleged that PEM conspired with and fraudulently transferred the equipment and proceeds to JBI and Trude, to Golden West and LaDon, or to Charles Peterson.

JBI and Trude timely answered, but the third-party defendants did not. The district court ordered a default judgment against all third-party defendants, but it stayed the entry

4

of judgment. Golden West and LaDon eventually answered, and the district court vacated the judgment as to them and accepted their untimely answer. It ordered discovery. PEM and Bud and Charles Peterson did not answer.

By this time, Glenwood already had a contentious discovery history with JBI and Trude. Glenwood had served interrogatories on JBI and Trude on April 15, 2013, and served supplemental document requests and interrogatories on April 26. JBI and Trude had not answered Glenwood's interrogatories or document requests for two months after an extended deadline, so Glenwood moved to compel discovery and sought sanctions. JBI and Trude responded to Glenwood's interrogatories immediately before the hearing on Glenwood's motion. The district court found their response untimely without excuse and sanctioned Trude individually to pay Glenwood's costs in bringing the motion.

A dispute regarding earthmoving equipment not seized during the repossession took the forefront of the litigation. Ziegler Caterpillar had sold several pieces of equipment to PEM or Bud in a transaction that included a security agreement. This transaction became the subject of dispute during PEM's attempted bankruptcy filing in July 2011. Trude had signed the bill of sale, the promissory note, and the security agreement with Ziegler. In March 2014, Glenwood filed a motion seeking limited summary judgment and a declaration that Glenwood now owned the equipment sold by Ziegler. The district court granted Glenwood's motion, but Trude refused to tell Glenwood where the equipment was located.

Glenwood's discovery conflicts with JBI and Trude continued, and Glenwood again sought the court's involvement. On August 29, 2014, the district court ordered Trude to

5

allow Glenwood to take JBI's business laptop offsite to forensically analyze it. JBI complied, sort of. It turned the computer over, but Glenwood's forensic analyst determined that, just hours before Glenwood picked it up, someone had used data-wiping software to permanently delete more than 20,000 files from the computer.

The district court conducted a hearing to address Trude's laptop spoliation and its ongoing failure to disclose the Ziegler equipment's location. JBI and Trude claimed that JBI did not want to reveal the equipment's location because it was being used on job sites in North Dakota and any word of litigation would disrupt business. The district court was not persuaded and ordered Trude to disclose the equipment's location to Glenwood that same day, October 22, 2014. The order specified that Trude's disclosure must also be updated every time the equipment was moved. Trude still failed to disclose the equipment's location. So on October 24, the district court ordered Trude to disclose the equipment's location within 12 hours, to include certain information, and to allow a Glenwood representative to verify the equipment's location.

Trude disclosed only, "Williston, North Dakota Area." So on October 30, the district court ordered him to show cause why he should not be held in contempt for not adequately disclosing the Ziegler equipment's location. At a hearing on November 3 it held Trude in civil contempt and ordered him jailed until he complied with the court's disclosure order. Finally Trude revealed the location, and a few days later Bud showed Glenwood's representatives to the equipment. The district court then released Trude from jail.

On November 4, 2014, the district court decided the laptop spoliation issue. It found that Trude intended to destroy evidence to avoid Glenwood's discovery and that he acted

6

in bad faith. It held JBI and Trude in contempt for destruction of evidence, and it sanctioned them by dismissing their claims.

The district court also ordered JBI and Trude to show cause for their continued failure to disclose projects the Ziegler equipment was used on. The order warned that failure to show good cause may result in sanctions, including dismissal of JBI and Trude's answer. JBI and Trude failed to comply with the order, so the district court sanctioned them by striking their answer and ordering default judgment against them. In support of the sanction, the court noted JBI and Trude's continued failure to provide timely discovery responses, their intentional attempt to prevent Glenwood from knowing the Ziegler equipment's location, Trude's repeatedly making contradictory statements and engaging in perjury, Trude's bad-faith failure to comply with orders, and the destruction of data on the laptop. The district court entered a partial default judgment of $1,271,982.69, for which it held jointly and severally liable JBI and Trude, PEM and Bud, and Charles Peterson.

The case between Glenwood and Golden West and LaDon eventually proceeded to a four-day bench trial on Glenwood's claims of successor liability, MUFTA violations, and civil conspiracy.

At that trial, Glenwood's first witness was an excavating contractor who testified that he hired PEM to subcontract a project in early fall 2010. The contractor testified that Bud negotiated and supervised the job and that the equipment used on the project was labeled PEM. The subcontract identifies the subcontractor as PEM. The contractor testified that Bud told him not to pay PEM but to make the payments to JBI and Trude personally. The contractor testified that he developed the impression that PEM was reorganizing.

7

Glenwood submitted invoice and check documents indicating that PEM did the work and that JBI and Trude received the payment.

Glenwood also called Jeremy Runyon, owner of Excel Recovery, who had been previously hired by Ziegler to locate and repossess the equipment it had sold to PEM. Runyon testified that in June 2011, he found several pieces of the Ziegler equipment on a job site managed by the Knife River Company in North Dakota. Runyon testified that when he went on the job site, he saw equipment belonging to PEM and to Golden West; he was approached by LaDon and Bud; and LaDon pointed out the pieces of equipment that belonged to Golden West so that Runyon would not take them. Runyon also said that while working for Glenwood, he had repossessed a lowboy trailer that belonged to PEM, that was being pulled by a truck belonging to Golden West, and that was carrying a piece of the Ziegler equipment purchased by JBI.

The district court received into evidence the deposition testimony of a businessman who owns a building with a parking lot where LaDon and Bud parked their trailers while working in Williston. The witness testified that he met Bud and LaDon in 2011 and that Bud had rented office space in the building for the previous two or three years. He testified that he lent money to LaDon and Bud to help them buy scrapers. Glenwood introduced an unsigned loan agreement listing the witness's company as "Lender," "Golden West Transport" as "Borrower," and LaDon and Bud Peterson as "Guarantors." Glenwood also introduced emails and a voicemail transcript indicating that LaDon and Bud would repay the loan.

Glenwood also introduced deposition testimony of the equipment dealer who sold the four 627-scrapers financed by the loan. Glenwood introduced the invoices that listed the party billed as LaDon Peterson but included PEM's Litchfield address. Glenwood also introduced the invoice's facsimile coversheet, which identified the company as "Peterson Earth Movers," the recipient as "Don Peterson," and PEM's facsimile number.

Lee Stark testified that he knew the parties, particularly Charles Peterson (LaDon and Bud's father and a defaulting party). Stark offered the most inculpatory testimonial evidence of the alleged Peterson conspiracy. He testified that in fall 2011, Charles said that LaDon and Bud were working on the same job in North Dakota. He spoke with Charles a year later, in September 2012, and Charles told him that Bud had taken a bucket off a piece of equipment to North Dakota to avoid bank repossession. Charles also said that after Ziegler repossessed its equipment, they bought it back under a different name while PEM was in bankruptcy. Charles talked to Stark about LaDon and Bud buying the 627-scrapers with private financing and then using them to move dirt on projects that Bud and LaDon were working together on. Stark testified that Charles said, "[T]hey were running under a different name, not Peterson Earth Movers." Stark testified further, "[H]e said that the Bank thought they were going to get us but we were running under a different name and we outsmarted them."

Glenwood introduced many documents of PEM, JBI, and Golden West's business dealings. These included an agreement between PEM and a contractor dated September 22, 2010, for earthmoving work on a turkey farm. The invoice was from PEM to the project

9

contractor, but the contractor paid the invoice with a check written to "Peterson E," which was crossed out and replaced with "J.B.I."

Glenwood introduced a report of PEM to the bankruptcy court filed by Trude, which included a narrative stating, "In May [2011 PEM] moved equipment out to Williston, ND to begin work in the area. At this time PEM has a contract to strip topsoil for a construction project in Williston." Glenwood offered a contract signed by Trude on April 27, 2011, between the Knife River Company and JBI for earthmoving work to "strip" certain areas. The contract notes in the payment portion that "Bud and Brad agree to talk if there is a problem making money at that price." Glenwood introduced a PEM timesheet showing an employee worked from July 5 to July 9, 2011, on the "Knife River" project. Glenwood introduced a check from JBI to Golden West for $10,000 dated August 14, 2012, with "Transportation" in the memo line. An invoice from Golden West billed PEM for $3,730 on May 13, 2011, noting charges for transporting earthmoving equipment from Litchfield to Williston. Another Golden West invoice billed PEM $29,172, for hauling two 627-scrapers from Detroit to Williston.

Glenwood introduced more documentary evidence of the Peterson-Trude conspiracy. For example, it offered a contract effective August 3, 2011, between Gowan Construction Inc. and Golden West for earthmoving work using scrapers for a job in Tioga, North Dakota. A contract between Golden West and JBI, effective August 3, 2011, showed the same parameters for work in Tioga and payment of a little over half of Golden West's contract with Gowan. The bank also introduced a July 12, 2011 contract between Golden West and Minnesota Limited for earthmoving work at Beaver Lodge in Tioga, North

10

Dakota. An attachment indicates that the equipment to be used was "4-627 Scrapers." Glenwood introduced several checks from Golden West to JBI from August to September 2011, the largest of which is $165,935 and notes "Gowan" in the memo line. Glenwood introduced another PEM timesheet, showing another employee working on the "Minnesota Limited" project. Trude admitted that this worker was employed by JBI at that time.

Glenwood gave the court documents from Horizon Resources, based in Williston, showing that JBI opened an account to purchase fuel. Several billing slips for the fuel were also introduced, and these had "Peterson Earthworks" crossed out and "JBI" written in. Another billing slip says "sold to" "Peterson Bud, JBI." Two July 21, 2011 invoices from Horizon note "sold to" "Golden West JBI," but the slip lists JBI's account number. Glenwood also introduced a check from Golden West to Horizon Resources for $28,899.11, with its memo line indicating "Fuel at MN Limited." And the bank introduced a November 13, 2012 Golden West invoice billing Acme Concrete Paving for $4,680, describing work performed near Williston and noting work done specifically by Bud and LaDon. Other invoices and payments for work on the same project were also introduced, with these listing Earthworkx Specialty LLC and noting Bud Peterson.

Glenwood called Bud to testify. Bud maintained that after PEM's demise he worked for JBI as a project manager but insisted he was only an employee. Glenwood called LaDon, who admitted to subcontracting with JBI.

After the bench trial, the district court issued its findings of fact, conclusions of law, and order for judgment. The district court generally relied on the documentary evidence, found the testimony of Trude, Bud, and LaDon incredible, and generally credited the

11

testimony of Glenwood's witnesses. The court found that PEM and JBI were essentially the same company, using the same employees, the same equipment, and the same headquarters to perform the same type of work and circumvent PEM's debt to Glenwood. The court found that both Bud and LaDon took out the loan and both purchased the scrapers. It found that the Minnesota Limited and Gowan contracts were performed by a hybrid of PEM and JBI and Golden West and that these jobs primarily used the four 627-scrapers. The court emphasized that the fuel billing documents show Golden West's complicity in PEM's attempt to avoid its creditors.

The district court concluded that Golden West and LaDon held job proceeds and equipment that PEM fraudulently transferred to Golden West, and that Glenwood had proved successor liability between the companies. It found that LaDon and Golden West conspired with PEM, Bud, JBI, and Trude to defraud the bank. It held Golden West liable under MUFTA for the scrapers and the Gowan and Minnesota Limited contracts. The court pierced Golden West's corporate veil to hold LaDon personally liable, and it entered judgment against LaDon and Golden West for $1,265,406, jointly and severally liable with JBI and Trude, PEM and Bud, and Charles Peterson.

The district court also ruled on a motion it received several weeks before trial. PEM and Bud had moved for relief from judgment under Minnesota Rule of Civil Procedure 60.02. The district court denied the motion. Golden West and LaDon moved for posttrial relief under Minnesota Rules of Civil Procedure 59 and 52, and the district court also denied this motion. JBI and Trude, PEM and Bud, and Golden West and LaDon appeal.

12

**D E C I S I O N**

We have consolidated the appeals in these cases and resolve them all here. The appealing parties raise multiple challenges to the district court's judgments and orders. We have carefully considered each argument, and we see nothing in them that edges us toward reversing. For the following reasons we affirm the district court's denial of PEM and Bud's motion for relief from judgment, the district court's entry of default judgment against JBI and Trude, and the district court's judgment against Golden West and LaDon following the bench trial.

## I.      PEM & BUD PETERSON

PEM challenges the district court's denial of its motion for relief from judgment under Minnesota Rule of Civil Procedure 60.02. A party may obtain relief from final judgment on the basis of "[m]istake, inadvertence, surprise, or excusable neglect." Minn. R. Civ. P. 60.02(a). A party's right to relief under rule 60.02(a) is analyzed through four factors. *See Finden v. Klaas*, 268 Minn. 268, 271, 128 N.W.2d 748, 750 (1964); *Hinz v. Northland Milk & Ice Cream Co.*, 237 Minn. 28, 30, 53 N.W.2d 454, 456 (1952). The court must consider whether the moving party has shown (1) a reasonable defense on the merits; (2) a reasonable excuse for the failure or neglect to answer; (3) it acted diligently after notice of entry of judgment; and (4) no substantial prejudice will result to the other party. *Finden*, 268 Minn. at 271, 128 N.W.2d at 750. A district court has broad discretion to grant or deny relief from judgment under rule 60.02, and we will reverse only if it has abused that discretion. *Northland Temps., Inc. v. Turpin*, 744 N.W.2d 398, 402 (Minn. App. 2008),

13

*review denied* (Minn. Apr. 29, 2008). When the moving party fails to establish all four factors, the district court has discretion to grant or deny the motion. *See id.* at 407.

PEM argues all four rule 60.02 factors weigh in its favor. The district court found otherwise. It did find that PEM acted diligently after it received notice of entry of the judgment, but it denied relief because it found that factors one, two, and four weighed against PEM. We will uphold the district court's decision if we conclude that even one factor disfavors PEM. *See id.* Because the district court correctly determined that PEM failed to carry its burden by presenting evidence that Glenwood would not be prejudiced if PEM's default were vacated, we hold that the district court did not abuse its discretion.

The burden is on the moving party to show that no substantial prejudice to the other party will result from relief from the default judgment. *Nelson v. Siebert*, 428 N.W.2d 394, 395 (Minn. 1988). Our review of the record convinces us that the district court was correct that PEM did not carry its burden on this factor.

PEM's original memorandum to the district court in support of its 60.02 motion failed even to assert that Glenwood would not be prejudiced by the court's vacating the judgment. It gave no reason why, on the eve of trial, the reintroduction of a key party would not prejudice the bank. The extensive correspondence of the parties with the district court similarly does not suggest that PEM ever asserted (let alone established) that the bank would not be prejudiced. Finally in its two amended memoranda in support of its motion, PEM did raise the issue of prejudice. But it did so by alleging merely that "there will be no prejudice to GSB, which has taken no action to enforce its judgment anyway." The only rationale PEM offered was that Glenwood "has had ample opportunity to enforce its

14

judgment." And at the motion hearing PEM's counsel did not make any argument about Glenwood's lack of prejudice.

The closest thing to an actual argument about prejudice shows up in PEM's reply brief to Glenwood's response to PEM's various rule 60.02 motion memoranda. In that reply brief, PEM argued that Glenwood was not prejudiced by PEM's default because the bank would have had to pursue JBI and Trude anyway. But this misunderstands the focus of the issue of prejudice, which is not whether the default prejudiced the opposing party but whether reopening the case *after* the default would cause substantial prejudice. *Lund v. Pan Am. Machs. Sales*, 405 N.W.2d 550, 554 (Minn. App. 1987).

Given PEM's lack of any argument on this point in its moving papers, we have no reason to conclude that the district court erroneously decided the factor. We add that, in this lengthy dispute, PEM did not file its motion to vacate the default judgment until March 27, 2015, just two-and-a-half weeks before trial. Although some of the trial evidence would likely have been the same regardless if the claims against PEM were decided on the merits rather than by default, PEM does not contend that all of it would have been the same or that the difference would have been so slight that a separate trial could have been avoided and another delay averted. PEM fails to explain how Glenwood would not be substantially prejudiced if it must participate in two separate trials covering most of the same ground with allegedly conspiratorial actors.

Because the district court did not err when it held that PEM wholly failed to meet its burden to show that Glenwood would not be substantially prejudiced by vacating PEM's default judgment, we see no abuse of discretion in its dismissing PEM's 60.02 motion.

15

## II.    JBI & TRUDE

JBI and Trude argue that striking their answer was too extreme a sanction for their discovery violations. They attempt to apply the 60.02 factors. *See Finden*, 268 Minn. at 271, 128 N.W.2d at 750. We will instead look to caselaw and the procedural rules that frame a district court's discretion to order a default judgment for discovery violations.

When a party has willfully refused to comply with discovery orders without excuse or justification, that party forfeits the right to proceed on the merits. *Breza v. Schmitz*, 311 Minn. 236, 237, 248 N.W.2d 921, 922 (1976). The applicable procedural rule provides that if a party "fails to obey an order to provide or permit discovery" the district court may "make such orders in regard to the failure as are just." Minn. R. Civ. P. 37.02(b)(3). The rule specifically contemplates as a remedy for such a violation, "An order striking pleadings or parts thereof, . . . dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." *Id*.

We review discovery-related orders, including dismissals for discovery sanctions, for abuse of discretion. *Frontier Ins. Co. v. Frontline Processing Corp.*, 788 N.W.2d 917, 922 (Minn. App. 2010), *review denied* (Minn. Dec. 14, 2010). Sanctions imposed in response to a party's spoliation of evidence are likewise reviewed for abuse of discretion. *Miller v. Lankow*, 801 N.W.2d 120, 127 (Minn. 2011). We recognize, however, that dismissal with prejudice is the most punitive sanction and should be granted only in exceptional circumstances. *Firoved v. Gen. Motors Corp.*, 277 Minn. 278, 283, 152 N.W.2d 364, 368 (1967). We hold that Trude's extensive and repeated serious discovery

16

violations warranted the district court to exercise its discretion in first striking JBI and Trude's affirmative claims and then striking its answer.

This court has previously compiled several factors that appellate courts have considered when considering whether the district court abused its discretion in imposing discovery sanctions: (1) whether the court set a date for compliance; (2) whether the court warned about potential sanctions; (3) whether the party's failure to cooperate with discovery was part of a pattern; (4) whether failure to comply was willful and without justification; and (5) whether the moving party has demonstrated prejudice. *Frontier Ins. Co.*, 788 N.W.2d at 923. Our review of the record informs us that all factors favor the district court's determination to impose the most extreme discovery sanctions here.

### *Dates Set for Compliance*

The district court set clear dates for the discovery responses. Several months after the initial discovery dispute over document review, the district court granted both parties' motions to compel and set a discovery disclosure date of September 19, 2014, for initial disclosures. The court order allowed Glenwood to take Trude's business computer offsite before September 19, 2014, for up to 24 hours to conduct a forensic analysis. It required Glenwood give Trude at least a 24-hour notice of its intent to take the laptop. Trude failed to comply with the September deadline. So the court ordered that JBI and Trude must respond by 4:30 p.m. on October 3, 2014.

Trude's discovery failures precipitated a show-cause hearing on October 21, 2014. The district court gave Trude until the following afternoon at 4:30 to disclose the specific location of each piece of equipment by reference to a job number and the nearest town.

17

Trude failed to comply. So the district court issued another order on October 24, specifying clearly the information that it required JBI and Trude to disclose "no later than October 26, 2014, at 12:00 p.m." It jailed Trude for civil contempt and ordered his continued custody until he complied. After Trude complied a day later, the district court required him to disclose the jobs that JBI had performed since 2013 because he had made contradictory statements—on the one hand claiming that the equipment was needed for jobs, and on the other that JBI had not performed any earthmoving work since 2012. The court found Trude's disclosure of the jobs that had been worked incredible, and it again ordered JBI and Trude to show cause for their failure to comply.

Trude neither provided good cause for failure to include all jobs nor corrected the deficiencies in the job list that the district court found incredible. Not only did a previously undisclosed job come to light during the hearing, at trial the court learned of still other jobs that JBI and Trude failed to disclose before the district court had dismissed their claims.

The district court provided JBI and Trude more than sufficient notice of dates for their compliance, and it sanctioned them only after their chronic noncompliance, partial compliance, and inconsistent compliance.

*Prior Warnings*

Counsel for JBI and Trude represented at oral argument to this court that the district court did not give clear warnings about potential or impending sanctions. Our review of the extensive record leads us to deem those representations baloney. The district court in fact repeatedly warned JBI and Trude of the consequences of their apparent evasion.

18

A significant factor in determining whether a sanction was appropriate is whether the district court clearly warned the party that dismissal or a similar sanction will result if the party fails to comply. *Sudheimer v. Sudheimer*, 372 N.W.2d 792, 795 (Minn. App. 1985). After granting Trude a deadline extension to view documents at Glenwood's counsel's office—an extension Trude said he needed to respond to discovery—the district court imposed sanctions on Trude personally because he failed to provide answers to interrogatories and requests for production for more than three months after the extension. On June 14, 2013, the district court ordered that Trude view the documents by July 22, 2013, and warned that if the viewings did not take place it may order that Trude not be allowed to introduce any of the evidence at trial. In its scheduling order on August 23, 2013, the district court stated in bold and underlined text, "If the discovery deadlines are not followed on or before the deadline as set by this Court, then the Court may deem evidence or documents inadmissible for trial purposes as well as find sanctions . . . ."

The discovery disputes continued for the next several months. So on September 29, 2014, the district court denied Trude's request not to answer interrogatories and found that JBI and Trude had violated the court's previous grant of both parties' motions to complete disclosures by September 19, 2014. The court ordered Trude to comply, and it warned that if Trude "fails to abide by this, or previous Orders of this Court, then the Court shall consider sanctions at a motion hearing pursuant to Minn. R. Civ. P. 37." That rule specifically authorizes the sanction of "dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party." Minn. R. Civ. P. 37.02(b)(3).

19

After the district court awarded summary judgment to Glenwood for ownership of the Ziegler equipment and ordered JBI and Trude to disclose the equipment's location, the court issued an order detailing the requirements for the information to be disclosed, warning also, "Failure to abide by this Order, or any other such Order of this Court, could result in sanctions or contempt upon that party." When Trude failed to comply with the order by not providing a specific location for the equipment, the court warned in its October 24 order, "Failure to abide by this Order will result in a finding that Plaintiffs are in immediate contempt of court, a hearing will be conducted and the Court will consider jail time and/or dismissal of Plaintiffs entire action with prejudice."

When Trude still refused to disclose the required information, the district court held him in civil contempt, confined him in jail, and issued another order on November 4, 2014. This order warned that, under rule 37.02(b)(3), a court has the power to strike all pleadings, dismiss the action, and render a default judgment against the disobedient party. The order again noted, "Failure to abide by this Order will result in a finding that Plaintiffs are in immediate contempt of court, a hearing will be conducted and the Court will consider additional jail time, fines, and/or additional sanctions." When Trude provided the location of the equipment to Glenwood but still did not fully comply with the disclosure of all jobs performed, the district court issued an order to show cause on November 19, 2014. The order provided, "If good cause is not shown, appropriate sanctions may include contempt, or dismissal of the Plaintiffs remaining pleadings."

Although the district court provided no specific warning regarding failure to comply with turning over the laptop, none appears necessary to put a party on notice that destroying

20

evidence is impermissible and will likely result in sanctions. "[C]ustodial parties have a duty to preserve relevant evidence for use in litigation" and may destroy evidence only when there is a legitimate need and the noncustodial party is provided with "sufficient notice and a full and fair opportunity to inspect the evidence." *Miller*, 801 N.W.2d at 128. Trude never claimed that the laptop data was wiped for any legitimate purpose. He instead claimed ignorance.

The district court gave JBI and Trude clear and repeated warnings of the consequences of their persistent failing to comply with its orders.

### *Pattern of Violations*

Simply put, Trude's discovery violations were not isolated and clearly reflect a pattern to obstruct litigation tactically and to avoid disclosure. *See Williams v. Grand Lodge of Freemasonry AF & AM*, 355 N.W.2d 477, 480 (Minn. App. 1985) (upholding dismissal and noting that plaintiff's "refusal to cooperate in discovery was not an isolated instance"), *review denied* (Minn. Dec. 20, 1984). The district court found that "Plaintiffs appear to be playing games with the discovery process, with the Court's Orders, with the other parties, and with the Court." We need not recount the overwhelming evidence of the repeated violations that support the finding on this factor.

### *Willful Violations with No Justification*

Sanctions under rule 37 may include "dismissal of all or part of a claim if a party willfully and persistently fails to comply with a discovery order without justification or excuse." *Frontier Ins. Co.*, 788 N.W.2d at 922. The district court consistently found no justification for Trude's violations. When the district court first sanctioned Trude on

21

December 20, 2013, it found his failure "inexcusable" and intentional. When it held Trude in contempt, the district court found that he acted in bad faith and flagrant disregard for the court's order. And when it struck JBI and Trude's answer, it found that Trude failed to justify the nondisclosure, had acted in bad faith, provided misleading or untrue information, and testified falsely. All of the district court's findings on Trude's misconduct, willfulness, and unpersuasive justifications are abundantly supported by the record. For one example, the record informs us that the computer-wiping program had been installed and run at 2:39 a.m. on the morning that Trude turned the laptop over to Glenwood, and the wiping program itself had then been deleted without any disclosure to Glenwood, let alone any justification.

*Prejudice*

Caselaw emphasizes that prejudice is the primary factor in justifying the imposition of a rule 37.02 sanction striking pleadings and rendering a default judgment. *Firoved*, 277 Minn. at 283, 152 N.W.2d at 368; *Sudheimer*, 372 N.W.2d at 794. The district court found that JBI and Trude's "flagrant pattern of violating discovery rules and Court Orders has impaired [Glenwood's] ability to establish [its] case and [JBI and Trude's] non-complying conduct in not producing documents has deprived [Glenwood] of a fair trial." The court also noted that the absence of evidence from the laptop "cripples [Glenwood] because they have no to very little documentation of Mr. Trude and Plaintiffs daily business and/or documented business activities." Trude faults the district court for not saying what parts of the litigation the destroyed evidence would have pertained to. Obliterating documentary evidence in a fraud and conspiracy case and then chiding the sanctioning court for not

22

identifying exactly how the obliterated evidence would have affected the case is not an especially persuasive strategy. For obvious reasons, a party's failure to produce evidence allows a fact-finder to infer that, if the evidence had been produced, it would have been unfavorable to the party who failed to produce it. *Wajda v. Kingsbury*, 652 N.W.2d 856, 861 (Minn. App. 2002), *review denied* (Minn. Nov. 19, 2002). The district court was permitted to (and reasonably did) infer that the laptop contained information helpful to Glenwood and harmful to JBI and Trude.

We observe also that Glenwood was prejudiced not only by unknowable evidence but by Trude's ultimate failure to disclose all jobs performed in the period relevant to Glenwood's claims against all parties. Although Glenwood had some evidence that JBI subcontracted for Golden West, this was disclosed by Golden West and not JBI and Trude.

The district court's dismissal of JBI and Trude's affirmative claims, its striking of their answer, and its issuing a default judgment were well within its discretion after the court's considerable, demonstrated patience with Trude's ongoing flouting of discovery obligations.

***Other Claims on Appeal***

JBI and Trude argue that the district court erred by deciding the issue of the Ziegler equipment in favor of Glenwood and that it erred in "consolidating" cases. We do not address these issues because even if the court erred (and we are not indicating that it did), JBI and Trude were nevertheless obligated to follow its orders. They raise several other meandering issues on the merits of the underlying claim on which they defaulted. We will not discuss these issues. We affirm the district court as to JBI and Trude's appeal.

### III. GOLDEN WEST & LADON PETERSON

Golden West and LaDon raise several challenges to the district court's application of the claimed causes of action to these facts, arguing (1) ascribing successor liability was inappropriate because the district court did not find there was a transfer of *all* assets of one company to another; (2) liability is inappropriate under MUFTA because contracts are not property subject to MUFTA and the district court never found that PEM owned the contracts or the scrapers to transfer them to Golden West; (3) the district court could not expand liability under a conspiracy theory because a violation of MUFTA is not an underlying tort able to serve as the basis for the conspiracy; and (4) the district court abused its discretion by piercing Golden West's corporate veil to impose liability on LaDon individually.

Glenwood asserts that Golden West and LaDon have forfeited each of these issues because they did not raise them in their answer, during discovery, in a pretrial statement, at trial, or in posttrial motions. Glenwood contends that by changing course on appeal, Golden West deprived the district court of the ability to assess or remedy any alleged errors. And it maintains that the sole issue at trial was whether it could produce sufficient evidence to support its claims. Only now, argues Glenwood, after years of litigation, Golden West switches theories on appeal challenging the legal sufficiency of Glenwood's claims.

Although Golden West and LaDon filed a reply brief, the brief contains no response to Glenwood's forfeiture arguments.

When a party has not moved for a new trial, the scope of review is limited to whether the evidence sustains the fact-findings and whether the findings support the conclusions of

24

law and judgment. *Gruenhagen v. Larson*, 310 Minn. 454, 458, 246 N.W.2d 565, 569 (1976). And trial-procedure matters, evidentiary rulings, and jury instructions may be reviewed on appeal only if there has been a motion for a new trial where the matters have been assigned as error. *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn. 1986). A motion for a new trial gives both the district court and counsel the opportunity to more fully develop critical aspects of the record for appeal. *Id.* This process requires counsel to draw the district court's attention to the specifics of an objection where the impact may not have been understood during trial. *Id.* This rule preventing review of issues not raised in posttrial motions "does not apply to substantive questions of law that were properly raised during trial." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 310 (Minn. 2003). But this does not mean that Golden West may raise questions of law on appeal that were not raised in a posttrial motion *and* not properly raised during trial. *See id.* at 311. The supreme court pointed out in *Alpha Real Estate* that Alpha had raised the issues twice during the course of trial, in a summary judgment motion, and in a posttrial brief, and the court explained that this gave the district court the opportunity to consider the issues and time to flesh out or refine its reasoning. *Id.* Nothing like that occurred here.

We hold that Golden West forfeited any arguments relating to the application of successor liability, MUFTA, and conspiracy, by failing to argue these issues at any time to the district court. No argument resembling these appellate challenges exists in Golden West's posttrial motion and no discussion of these issues occurred at the posttrial hearing. The posttrial motion includes one paragraph on a broad and vague argument challenging as flawed "the legal theory on which the Court based its finding of liability against Golden

25

West and LaDon Peterson." The argument cites no legal authority, does not specifically indicate which theory of liability found by the court is allegedly flawed, and has no earmarks of a sufficiently developed issue so as to preserve it for appeal. We do not consider the arguments on their merits.

Construed quite liberally, however, it does appear that one of Golden West and LaDon's arguments was credited by the district court, at least in a broad sense. The district court noted in its order on Golden West and LaDon's posttrial motions that LaDon argued that the district court had erred by piercing the corporate veil to find him personally liable. LaDon appeared to argue that successor liability, civil conspiracy, and alter ego are incompatible notions and this prevented him from being individually liable. In its memorandum of law, the district court held that these were not incompatible theories and explained that it applied the equitable corporate-veil remedy because Golden West was used for fraudulent purposes. It made substantial findings that Golden West engaged in a civil conspiracy to commit fraud and effectuate fraudulent transfers.

LaDon deems erroneous the district court's finding that Golden West's corporate veil should be pierced to hold him personally liable, arguing that the district court's reliance on a fraud theory is misplaced. A court may hold a party individually liable for acts of a corporate entity if the party uses the corporate entity for a fraudulent purpose. *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. App. 2009). LaDon maintains that veil-piercing fraud must include evidence of fraud in the use of the corporate form itself, and he implies that it is further limited to using the corporate form to

26

conceal or misrepresent assets of the corporation's owner. We do not think the law supports LaDon's argument.

Piercing the corporate veil is an equitable remedy used to avoid injustice. *Id.* We review the district court's exercise of this equitable power for abuse of discretion. *Id.* Although Golden West cites cases in which the corporate form was used to conceal the assets of the owner or shareholder of the corporation, the fraud justification for piercing the corporate veil is not so limited. In fact "proof of strict common law fraud is not required," and instead "evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner" is all that must be presented to support the claim. *West Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 898 n.3 (Minn. 1981). Minnesota caselaw consistently allows veil piercing where "a corporation is used as an instrument of fraud," *Whitney v. Leighton*, 225 Minn. 1, 8, 30 N.W.2d 329, 333 (1947), and it imposes no restriction to situations in which the corporate form was used to fraudulently conceal assets of a nonowner. LaDon's argument simply has no support in the law, so we reject it. The evidence amply supports the finding that LaDon and other conspirators used Golden West to protect PEM and Bud from Glenwood's judgment.

Because Golden West has also not developed any argument on appeal on the preserved issue as to whether the evidence supports the district court's findings, we do not discuss that argument, except to say that our careful review of the record informs us that the argument would certainly fail. Golden West's last claim, regarding attorneys' fees, is premised on Golden West succeeding on its successor-liability claim. Because Golden

West gives us no reason to reverse the district court's judgment on any claim, no discussion on this issue is necessary.

**Affirmed.**