Dale M. STONE, Respondent,

v.

**JETMAR PROPERTIES, LLC,** at al., Defendants,

Selwin Ortega, Appellant.

No. A06–851.

Court of Appeals of Minnesota.

June 12, 2007.

John M. Tancabel, St. Paul, MN; and John D. Hagen, Jr., Minneapolis, MN, for respondent.

Alex W. Russell, Evening & Weekend Law Offices, St. Paul, MN, for appellant.

Considered and decided by WORKE, Presiding Judge; LANSING, Judge; and COLLINS, Judge.*

## OPINION

LANSING, Judge.

This appeal arises out of a series of real-estate transactions that resulted in the foreclosure sale of property that respondent Dale Stone had quitclaimed to a limited-liability company that was not yet organized when he attempted delivery. The foreclosure sale was initiated by Selwin Ortega, to whom the property had been mortgaged. Ortega appeals from an order establishing Stone's title to the property and providing damages. Ortega argues that the district court erred by concluding that the quitclaim deed was void, rejecting Ortega's claim that he was a good-faith purchaser for value, and failing to determine that Stone was equitably estopped from asserting an interest in the property and that Stone's claims constituted an impermissible collateral attack on a valid judgment. Because we conclude that the quitclaim deed was void and that Stone is not legally or equitably precluded from asserting his interest in the property, we affirm.

## FACTS

Keith Hammond drafted and signed articles of organization for Jetmar Properties, LLC, in November 2002, but he did not file the articles with the secretary of state. Later that same year, Hammond, acting as president of Jetmar, offered to buy commercial property from Selwin Ortega. Hammond and Ortega signed a purchase agreement, but the sale did not close because Hammond did not have the money. Nonetheless, based on Hammond's representation that he needed cash to develop the property into condominiums, Ortega gave Hammond a three-day, unsecured $200,000 loan, which Hammond failed to repay.

In April 2003 Hammond met Dale Stone, a retiree, and convinced him to invest in several of Jetmar's "real estate ventures." During the course of their relationship, Stone gave Hammond more than $50,000 in cashiers' checks for Jetmar's various projects. Sometime in May 2003, Hammond asked Stone to quitclaim a duplex to Jetmar to improve Jetmar's balance sheet, which would allow it to secure financing for a large condominium development. Stone was renting out the property to supplement his social-security income. In exchange for the deed, Hammond promised Stone an interest in the development. Hammond also told Stone that he would deed the property back to Stone "free and clear" in sixty days and that Stone could continue to collect rent. On May 14, 2003, Stone quitclaimed the property to Jetmar. Hammond purported to accept the deed as Jetmar's president and recorded it the same day.

On May 15, 2003, Hammond mortgaged the duplex to Ortega in exchange for an extension on the $200,000 loan. Ortega

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

recorded the mortgage on May 20, 2003, after checking the title and determining that Jetmar had title to the property by virtue of a quitclaim deed from Stone.

Hammond did not repay the loan or deed the property back to Stone. Sometime around December 2003, Ortega began foreclosure proceedings. Ortega sent the duplex tenants a notice of foreclosure, which they passed along to Stone. Stone confronted Hammond about the mortgage, but he was told that there would be time to redeem and regain title to the property. Based on Hammond's assurances, Stone did not alert Ortega of his claimed interest. On March 2, 2004, Ortega conducted a sale under the foreclosure-by-advertisement procedures. Because there were no higher bidders, Ortega purchased the property in exchange for the surrender of his $200,000 claim against Jetmar. Hammond filed Jetmar's articles of organization on March 11, 2004, and received a certificate of organization.

Stone brought this action in October 2004, alleging that Hammond and Jetmar had defrauded him in violation of Minn. Stat. § 325F.69, subd. 1 (2006). Stone sought damages and a declaratory judgment that he was the owner of the duplex. Ortega filed an answer, but Hammond and Jetmar failed to respond. The district court concluded that, because Jetmar did not exist at the time of delivery, it was therefore incapable of taking title to land, and the quitclaim deed was void. Because the quitclaim deed was void, both the mortgage and the foreclosure were also void. The district court also concluded that Ortega was not a good-faith purchaser for value under Minn.Stat. § 507.34 (2006). Based on these conclusions, the court awarded Stone damages and title to the duplex. This appeal followed.

## ISSUES

I. Did the district court correctly conclude that Dale Stone's quitclaim deed to Jetmar Properties, LLC, was void?

II. Is Stone barred by the corporation-by-estoppel doctrine from challenging Selwin Ortega's title to the property?

III. Did the district court correctly conclude that Selwin Ortega is not a good-faith purchaser for value under Minn.Stat. § 507.34 (2006)?

IV. Is Stone's challenge to Ortega's title to the property an impermissible collateral attack on a valid judgment?

## ANALYSIS

### I

Selwin Ortega argues that the district court erred by concluding that Dale Stone's quitclaim deed to Jetmar Properties, LLC, was void. Ortega claims that Jetmar was a de facto corporation when the deed was delivered, and, alternatively, that Jetmar was not per se barred from accepting delivery of the deed despite its nonexistence at the time of transfer. Because Ortega's de facto-corporation claim raises an issue of statutory construction, it is subject to de novo review. *Weston v. McWilliams & Assocs., Inc.,* 716 N.W.2d 634, 638 (Minn.2006). Ortega's claim that a deed can be delivered to an entity that did not exist at the time of transfer is also subject to de novo review. *See Nelson v. Productive Alternatives, Inc.,* 715 N.W.2d 452, 454 (Minn.2006) (interpreting question of common law under de novo standard).

Ortega first argues that, although Jetmar had not filed its articles of organization when Stone delivered the quitclaim deed, Jetmar could accept the deed under the de facto-corporation doctrine. Ortega claims that any suggestion that the de facto-corporation doctrine has been abol-

ished in Minnesota is unfounded because it appeared only in the Reporter's Notes to Chapter 302A of the Minnesota Statutes, Minnesota cases continue to refer to the doctrine even after the enactment of chapter 302A, and it is unclear whether any prohibition against de facto corporations found in chapter 302A necessarily extends to limited-liability companies (LLC), which are governed by chapter 322B. The law and the facts do not support these arguments.

Historically, a de facto corporation could exist in Minnesota when there was "(1) some law under which a corporation with powers assumed might lawfully have been created; (2) a colorable and *bona fide* attempt to perfect an organization under such a law; and (3) user of the rights claimed to have been conferred by the law." *Evens v. Anderson,* 132 Minn. 59, 61, 155 N.W. 1040, 1041 (1916). Ortega's claim that the de facto-corporation doctrine applies in this case fails as a matter of fact because, as he acknowledges, there had been *no* colorable attempt to organize Jetmar under the LLC statute when Stone signed the deed. *Mabel First Lutheran Church v. Cadwallader,* 172 Minn. 471, 476, 215 N.W. 845, 847 (1927) (stating that if there has been no attempt to create corporation de jure there can be no corporation de facto). The LLC statute provides that an LLC is organized by filing articles of organization with the secretary of state. Minn.Stat. § 322B.105 (2006). Hammond made no attempt to file Jetmar's articles of organization with the secretary of state. As a result, even if the de facto-corporation doctrine had not been abolished, it would not apply. We conclude, however, that the doctrine has been abolished in the context of business-corporation law and, by extension, in the context of LLC law.

The 1981 notes accompanying the business-corporations statute that sets the effective date of a corporation's articles of incorporation specifically provide that "the doctrine of de facto corporations is inapplicable in this state after the enactment of this act." Minn.Stat. Ann. § 302A.153, reporter's notes (West 2006). The rationale for the abolition of de facto corporations is that the process for incorporating is so simple that no one could ever make a "colorable attempt" to incorporate and fail. Id. This court recognized the abolition of de facto corporations in *Warthan v. Midwest Consol. Ins. Agencies, Inc.,* 450 N.W.2d 145, 147–48 (Minn.App.1990), when, after quoting the reporter's notes, we observed that the "use of advisory committee reports is recognized in this state as a tool for ascertaining legislative intent." *Id.* at 148 n. 2.

Minnesota cases that continue to refer to the availability of the de facto-corporation doctrine after the enactment of the business-corporation statute are distinguishable. In *Almac, Inc. v. JRH Dev., Inc.,* for example, we acknowledged that the "law gives equal recognition to de facto corporations." 391 N.W.2d 919, 924 (Minn.App.1986), *review denied* (Minn. Oct. 17, 1986). But *Almac* involved events that occurred in November 1980, before the new business-corporations statute went into effect. *Id.; see* 1981 Minn. Laws ch. 270, § 144, at 1232 (setting effective date of statute as July 1, 1981). Similarly, in *Ross v. Briggs & Morgan,* we stated that a "de facto corporation may have existed." 520 N.W.2d 432, 436 (Minn. App.1994), *rev'd,* 540 N.W.2d 843 (Minn. 1995). But the statement was peripheral to the central holding and did not derive from an interpretation of section 302A.153. Id. at 436–37. Thus these cases do not support Ortega's claim that the de facto-corporation doctrine remains viable in the context of business corporations.

We also reject Ortega's claim that even if the de facto-corporation doctrine was abolished for purposes of business corporations it has not been abolished for LLC purposes. The 1992 notes to the LLC statute explain that "[t]o the extent a chapter 322B provision resembles a chapter 302A provision in substance, the case law and Reporter's Notes of chapter 302A should be used to interpret and apply the chapter 322B provision." Minn.Stat. Ann. § 322B.01, reporter's notes (West 2006). The LLC statute setting the effective date of articles of organization lists section 302A.153 as its source. Minn.Stat. Ann. § 322B.175, reporter's notes (West 2006). Because section 302A.153 serves as the basis for section 322B.175, and the law relevant to corporations guides our interpretation and application of the law relevant to LLCs, the prohibition against de facto corporations must extend to LLCs.

Like the business-corporations statute, the LLC statute provides organizers with an indisputably simple route to formal organization. Thus it is doubtful that one could actually make an unsuccessful "colorable attempt" to organize a de jure LLC. *See* Minn.Stat. § 322B.175 (making organization of LLC effective upon filing articles of organization with secretary of state and payment of fee). Accordingly, the district court did not err by concluding that Jetmar was not a de facto corporation when Stone executed the deed.

Ortega next argues that Jetmar's nonexistence at the time Stone executed the deed is not determinative of whether Jetmar could take title to the property. To transfer title, a deed must be delivered. *Slawik v. Loseth,* 207 Minn. 137, 139, 290 N.W. 228, 229 (1940). Ortega argues that when a deed is delivered to an "incipient" LLC, the transfer of title may take effect upon the LLC's formal organization. We disagree.

Under Minnesota law deeds cannot be delivered to nonexistent entities, whether the entities are natural or legal. A deed cannot be delivered to a deceased grantee, for example. *In re Estate of Savich,* 671 N.W.2d 746, 750 (Minn.App. 2003). Similarly, the supreme court has held that because an organization was not a corporation de jure or de facto, it could not take title to real estate. *Cadwallader,* 172 Minn. at 476, 215 N.W. at 847. We can find no basis in Minnesota law for delaying transfer of title to some indeterminate future date when the grantee might come into existence. In fact, "many, but not all, courts have denied validity to deeds conveying property to corporations which are not incorporated at the time of conveyance." 14 Richard R. Powell, *Powell on Real Property* § 81A.04[1][a][iii] (Michael Allan Wolf ed., 2006); *see also Savich,* 671 N.W.2d at 750 (citing § 81A.04[1][a][iii] of *Powell on Real Property*). According to these courts, "[t]he effective date of a deed is usually stated to be the date of delivery, and if at that date the corporation is 'non-existent,' the ordinary rule governs and the deed is treated as a nullity." 9 *Thompson on Real Property* § 82.08(a)(2) (David A. Thomas ed., 1994) (footnote omitted).

Ortega relies primarily on *Cmty. Credit Union Servs., Inc. v. Fed. Express Servs. Corp.,* 534 A.2d 331 (D.C.1987), for his claim that delivery of a deed to an incipient LLC may take effect upon the LLC's formal organization. In *Cmty. Credit Union,* the District of Columbia Court of Appeals observed that "a deed conveying property to an incipient 'corporation' that has not yet been incorporated passes title to the corporation as of the time of incorporation." 534 A.2d at 334. The decision on which *Cmty. Credit Union* relies for

support, *Zulver Realty Co. v. Snyder*, 191 Md. 374, 62 A.2d 276 (1948), holds that a deed to a grantee that is nonexistent when the deed is created can still pass if the grantee has come into existence at the time of delivery. 62 A.2d at 280. Neither case supports Ortega's theory.

■ The date of delivery is ordinarily presumed to be the date on the deed. Because Jetmar did not come into existence until almost a year after Stone delivered the deed to Hammond, *Zulver* does not apply. *Cmty. Credit Union* extends *Zulver* by delaying the question of delivery to the time of incorporation, but is also inapplicable because Stone did not have the requisite intent to convey the property when Jetmar was organized *after* the foreclosure sale.

We see no reason to deviate from the "ordinary rule" that a deed to an entity nonexistent at the time of conveyance is void. Limiting the question of delivery to the time of conveyance is not only consistent with Minnesota law, it is also a logical result given the ease of formal incorporation and organization. Allowing a form of future interest to vest in unorganized entities would be inconsistent with our public policy of encouraging legal organization.

## II

■ Ortega next argues that the doctrine of corporation-by-estoppel prevents Stone from taking title to the property. The district court did not expressly address Ortega's equitable claims, but it implicitly denied them by granting Stone's request for a declaratory judgment establishing title in him. *See Fraser v. Fraser*, 702 N.W.2d 283, 292 (Minn.App.2005) (finding implicit rejection of equitable claim in other judicial action), *review denied* (Minn. Oct. 18, 2005). The issue of estoppel is generally a question of fact. *N.*

*Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn.1979). We review fact questions for clear error. Minn. R. Civ. P. 52.01.

Ortega argues that under the corporation-by-estoppel doctrine Stone cannot take title to the property because Stone obtained an advantage by entering into a contract with Jetmar acting as an LLC, and Stone cannot now question the organization of the LLC. *See State v. Rivers*, 206 Minn. 85, 95, 287 N.W. 790, 794–95 (1939) (finding that mortgagor is estopped from denying validity of mortgagee's incorporation after obtaining advantage by contracting with mortgagee acting as corporation); *accord N. Bldg. & Loan Ass'n v. Witherow*, 205 Minn. 413, 416–17, 286 N.W. 397, 398–99 (1939); 8 William Meade Fletcher et al., *Fletcher's Cyclopedia of the Law of Private Corporations* § 3958 (perm.ed., rev.vol.2001) (stating that person who conveys deed to entity as corporation cannot avoid conveyance by denying corporate existence of grantee). Although section 302A.153 abolished the de facto-corporation doctrine, the reporter's notes to the same statute indicate that the corporation-by-estoppel doctrine "has nothing to do with the efficacy of an attempted incorporation, and may apply even where no documents have been filed with the secretary of state." Minn.Stat. Ann. § 302A.153, reporter's notes. Thus, the corporation-by-estoppel doctrine survives in Minnesota despite the inapplicability of the de facto-corporation doctrine. *Arbo Corp. v. Aidan Mktg./Distrib., Inc.*, 639 F.Supp. 1512, 1514 (D.Minn.1986).

■ Even if we assume, without deciding, that the corporation-by-estoppel doctrine applies to LLCs, Ortega's claim fails. Stone treated Jetmar as a "corporation" when he executed the deed. But the estoppel doctrine does not apply when the acts forming the basis for an estoppel

claim are induced by fraud. Fletcher et al., *supra*, § 3909. When a corporation is used to accomplish fraud, courts may disregard the corporate entity and permit plaintiffs to "pierce the corporate veil." *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979). Similarly, a court may refuse to apply the doctrine of corporation-by-estoppel when the corporation is used to accomplish fraud. The district court found that Stone executed the quitclaim deed while "relying on the false representations, promises, and assurances of Hammond." Because Stone was fraudulently induced to sign the deed and treat Jetmar as a "corporation," the district court could reject Ortega's corporation-by-estoppel argument.

### III

■ Ortega also disputes the district court's determination that he was not a good-faith purchaser for value under Minn.Stat. § 507.34 (2006). Whether one is a good-faith purchaser is a factual determination that will be sustained unless the reviewing court has a firm and definite impression that a mistake has been made. *Miller v. Hennen*, 438 N.W.2d 366, 369 (Minn.1989).

■ In a parallel argument, Ortega contends that equitable estoppel prevents Stone from taking title. A party is equitably estopped "from taking unconscionable advantage of his own wrong by asserting his strict legal rights." *N. Petrochemical*, 277 N.W.2d at 410. To prevail on his equitable-estoppel claim, Ortega "must prove that [Stone] made representations or inducements, upon which [Ortega] reasonably relied, and that [Ortega] will be harmed if the claim of estoppel is not allowed." Id. Silence can serve as a representation or inducement. *Macomber v. Kinney*, 114 Minn. 146, 156–57, 128 N.W. 1001, 1004 (1910).

■ The good-faith-purchaser statute operates to establish priority over earlier unrecorded conveyances. Minn.Stat. § 507.34. In this case, however, there is no earlier unrecorded conveyance to which the statute could apply to establish priority. Instead, Stone retained title to the property because his quitclaim deed to Jetmar was void. Consequently, Ortega has not established that the good-faith-purchaser statute applies. Powell, *supra*, § 81A.04[2][a][ii]. In addition, even if the good-faith purchaser statute applies, the record weighs against Ortega's claim in light of his failure to make even minimal reasonable inquiries into the transaction with Jetmar.

■ Public policy generally favors allowing a degree of reliance on the title shown in public records. *See Nussbaumer v. Fetrow*, 556 N.W.2d 595, 599 (Minn.App. 1996), *review denied* (Minn. Feb. 26, 1997) (stating policy of allowing judgment creditors to rely on record). But the reliance allowed is not absolute. A "party attempting to invoke the doctrine [of equitable estoppel] cannot be negligent and cannot have knowledge of the defect in the title." *W. Concord Conservation Club, Inc. v. Chilson*, 306 N.W.2d 893, 896 (Minn.1981). A prospective purchaser is obligated to discover anyone in possession of the land at issue and to "inquire into the nature and extent of the occupant's interest." *Id.* As a result of this obligation, the purchaser is held to have knowledge of all the "rights of the [possessor] and also of all facts connected therewith which reasonable inquiry would have developed." *Claflin v. Commercial State Bank*, 487 N.W.2d 242, 248 (Minn.App.1992), *review denied* (Minn. Aug. 4, 1992). "In order to have status as a bona fide purchaser the mortgagee's inquiry must be directed to the person in *possession*; inquiry of the mortgagor, who

may have reason to conceal the truth, is not sufficient." *Id.*

Under the unusual circumstances of this transaction, Ortega failed to make adequate inquiries about the property. Previously, Ortega had given Hammond an unsecured loan that Hammond failed to repay. In addition, Hammond had been unable to complete the purchase of Ortega's property due to lack of funds. This course of dealing should have alerted Ortega to the possibility of suspicious transactions like the one Hammond proposed. Jetmar had obtained the property through a quitclaim deed from Stone *the day before* Hammond offered the property as collateral.

■ Despite these "red flags," the record contains no evidence that Ortega ever made the minimal inquiries that would have informed him about the fraudulent nature of the transaction. Ortega never contacted Stone's renters to inquire about the nature of their rights, which would have inevitably led him to Stone and to the discovery of Stone's claimed rights. More significantly, Ortega never ascertained whether Hammond had the authority to act on Jetmar's behalf. When dealing with an agent, the purchaser "is put on inquiry and must discover whether the agent has the authority to complete the proposed act." *Chilson,* 306 N.W.2d at 896. Implicit in that obligation is the duty to establish whether the principal has the capacity to place authority in an agent. If Ortega had made these inquiries, he would have learned that Jetmar had never been formed and could not have had an interest in the property. Given his conduct, Ortega's claim of being a good-faith purchaser is tenuous at best, and the district court did not clearly err by finding that Ortega was not a good-faith purchaser for value.

Similarly, Stone is not equitably estopped from claiming title to the property.

Ortega argues that Stone induced him to act to his detriment in two ways. First, Ortega argues that Stone's purported conveyance to Jetmar, which was recorded, was a representation on which he detrimentally relied. Second, Ortega contends that Stone's silence when Ortega foreclosed and surrendered his claim against Hammond in exchange for title to the property was a representation on which he detrimentally relied. But because Ortega failed to make even minimal inquiries about the transaction, Ortega's reliance was itself not reasonable. Therefore, for the same reasons that Ortega is not a good-faith purchaser for value, Stone is not equitably estopped from claiming title.

## IV

■ Ortega's final argument is that Stone's challenge to the title he gained through the foreclosure sale is an impermissible collateral attack on a valid judgment. Ortega did not sufficiently raise this argument below, however, and he cannot raise it for the first time on appeal. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988). Furthermore, in their briefs, the parties agree that the foreclosure was conducted through foreclosure-by-advertisement procedures. Thus, there is apparently no judgment to attack. *See Guidarelli v. Lazaretti,* 305 Minn. 551, 554, 233 N.W.2d 890, 892 (1975) (noting that no hearing is held before foreclosure by advertisement). In any case, Ortega failed to produce any judgment or similar documentation to support his claim of collateral estoppel. Therefore, the argument is waived.

## DECISION

The district court did not err by concluding that the quitclaim deed was void and that neither law nor equity prevented

Stone from asserting his interest in the property.

**Affirmed.**