*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0531**

WAF-2, LLC,
Appellant,

vs.

Lowry Building, LLC,
defendant and third party plaintiff,
Respondent,

vs.

John R. Rupp,
third party defendant,
Appellant.

**Filed December 27, 2016
Affirmed
Stauber, Judge**

Ramsey County District Court
File No. 62-CV-14-1723

Mark R. Bradford, Amie E. Penny Sayler, Bassford Remele, P.A., Minneapolis, Minnesota
(for appellants)

Kelly S. Hadac, HKM, P.A., St. Paul, Minnesota (for respondent)

    Considered and decided by Worke, Presiding Judge; Stauber, Judge; and Bratvold,

Judge.

UNPUBLISHED OPINION

**STAUBER**, Judge

Following a court trial in this commercial-lease dispute, appellants challenge the district court's decision finding the tenant limited-liability company's principal liable for breach of the lease, awarding operating expenses as damages, and reforming the lease to provide for an award of attorney fees to the respondent landlord. We affirm.

## FACTS

Appellant WAF-2, LLC (WAF) sued respondent Lowry Building, LLC (Lowry), seeking specific performance and declaratory judgment of a restaurant lease, or, in the alternative, alleging a breach of the lease contract and requesting attorney fees. In its answer and counterclaim, Lowry brought a third-party complaint for breach of contract and attorney fees against appellant John Rupp, who is the "chief manager" and sole principal of WAF, alleging that Rupp was personally liable under the lease because WAF did not exist as a legal entity at the time the lease was executed. A court trial was held on March 9-11, 2015.

Rupp is a longtime real-estate developer in St. Paul. In 2012, Rupp experienced financial problems, and creditors threatened to foreclose on the single mortgage securing three of his properties, the St. Paul Building, the St. Paul Athletic Club, and the Lowry Building. Rupp placed the three properties in bankruptcy and attempted to work out an arrangement to pay off the discounted mortgage note. Rupp approached Jim Crockerall, another developer, and offered to sell him the Lowry Building.

Crockerall's wife and partner, Rosemary Kortgard, is also a real-estate developer. Kortgard formed respondent Lowry, a limited liability company (LLC); she is the sole owner and chief manager of Lowry, and Crockerall is its vice president. On June 8, 2012, Lowry purchased a 51% interest in the Lowry Building from Rupp for $5 million, with an option to purchase the remaining 49% interest after December 31, 2012. The purchase price exceeded the building's market value of $2 million, but Rupp, who owns the successful St. Paul restaurant W.A. Frost, agreed to lease space in the Lowry Building to establish a restaurant, with the intent that revenue generated from the restaurant would justify the higher sale price. At the same time, Lowry entered into a lease agreement with WAF for a restaurant that would be housed in the Lowry Building.

Rupp signed the lease agreement on behalf of WAF, but Lowry, Kortgard, and Crockerall were unaware that Rupp did not execute the articles of organization for WAF until July 31, 2012, six weeks later, and the secretary of state did not issue WAF's certificate of organization until August 1, 2012. At trial, Rupp admitted that WAF had "never been capitalized," had no bank accounts, had paid for expenses out of business accounts belonging to other entities, did not create annual account statements, and likely had not filed any tax returns, although WAF expenses may have appeared on Rupp's personal-income-tax returns as "Schedule E property."

According to the lease terms, WAF agreed to establish a restaurant and bar in the south and southeast portion of the first floor, the basement and sub-basement, and on the 11th and 12th floor roofs of the Lowry Building. The lease had a ten-year term, renewable for eight additional five-year terms. The rent was equal to five percent of the

annual gross proceeds, "with monthly installments of $6,250.00 to be credited to such 5% of the annual gross proceeds." It also included the restaurant's share of the building operating expenses, as "mutually agreed upon by Lessor and Lessee." Rent was due beginning on June 1, 2013. As part of the sale of the building, WAF deposited $71,822.33 with Lowry to be used for tenant improvements. Of this amount, $24,000 was used to return a security deposit to a former Lowry Building tenant after Rupp failed to do so.

The lease anticipated that the first-floor restaurant would open by December 31, 2012, the basement by April 30, 2013, and the rooftops by September 30, 2013. Under the terms of the lease, Lowry and WAF were to agree on the floor plan of the restaurant and bars. WAF was responsible for all tenant improvements and was required to provide plans and specifications for review and approval by Lowry. Lowry agreed to supply "improvements customarily referred to as a 'vanilla shell' including but not limited to: fun[c]tional air handlers[,] supply heating and cooling but not ductwork[,] electrical service panel submetered, water and gas to the premises, and an external duct to the premises [in] a mutually agreeable location." The parties did not further define a "vanilla shell," a construction-industry term that means different things depending on the circumstances and the agreement of parties to a construction contract. The parties executed a lease amendment in August 2012, under which Lowry agreed to provide WAF with an additional $250,000 credit for tenant improvements.[1]

---

[1] Rupp claimed that Ramsey County defaulted on a lease in the building and that he had a substantial claim against the county. The county refused to lease space with Lowry

4

By December 2012, no restaurant construction had started and Rupp sent Crockerall two e-mails that suggested Rupp was no longer interested in the restaurant project. Rupp had not yet supplied any plans or specifications for Lowry's approval. Rupp claimed that he could not supply plans or specifications because the parties had not agreed on the exact square footage of the premises. Crockerall testified that Lowry had provided Rupp with the square footage calculated by Rupp's architect, but that Rupp disagreed with the number. In November 2013, Rupp provided some floor plans, but the plans lacked details as to restaurant concept, equipment, mechanical, electrical, and restaurant layout. According to an architect who was hired by Lowry to assist in the renovations, plans for owner approval in this type of project would generally include "a full set of design documents delineating technical detail of wall locations, finishes, mechanical-electrical systems." The floor plans provided by Rupp would allow the city to make a preliminary review, but would not meet the definition of "plans and specifications."

Rupp claimed that he was unable to begin the improvements because he had not been provided with the promised "vanilla shell." A great deal of disagreement ensued over what the parties meant by "vanilla shell." For example, the architect testified that the concept "var[ied] from project to project or building type to building type." The architect described it as including rock concrete floors, air supply, electricity, and paint-ready walls. Rupp described it as primed sheetrock, a finish-ready floor, lighting,

---

unless Rupp waived his claim. Lowry agreed to supply an additional $250,000 credit for tenant improvements if Rupp would release the claim.

functional air handlers, heating and air conditioning, and access to gas, water, and electrical. Kortgard described it as "unfinished cement floor, . . . unfinished walls, . . . unfinished ceiling and . . . electricity, water, mechanicals going into [the] space" but also stated that it depended on agreement between parties. Crockerall testified that the "vanilla shell" was in place the whole time because there were walls, floors, a ceiling, and gas, water, and electrical service; the only thing lacking was mechanical hookup of air handlers, which could not be done until the restaurant was laid out.

Crockerall testified that Rupp appeared to be financially unable to complete the required tenant improvements. Crockerall also stated that Rupp presented details on several different restaurant concepts and Lowry was "frustrated" because of the changing plans.

The district court issued its findings of fact, conclusions of law, and an order for judgment, concluding that (1) WAF was not a legal entity at the time the lease was signed and, in any event, had not sustained its burden of proving a breach of contract; (2) Lowry had sustained its burden of proving that Rupp was personally liable under the lease for a breach of contract; (3) Lowry had sustained its burden of proving damages in the amount of $245,567.76; and (4) Lowry was entitled to attorney fees under the contract.

In October 2015, the district court awarded attorney fees and costs to Lowry in the amount of $249,422.04. The district court denied Rupp's and WAF's joint motions for amended findings of fact, conclusions of law, and order for judgment on February 18, 2016. On March 14, 2016, the district court sua sponte corrected a statement in its original findings to reflect that damages were awarded to Lowry up to the date of trial,

6

not the date on which the premises were surrendered. There was no change in the amount of the award. Appellants filed a notice of appeal on March 31, 2016.

## DECISION

"On appeal from judgment following a court trial, this court reviews whether the district court's findings were clearly erroneous and whether the district court erred as a matter of law." *In re Distrib. of Attorney's Fees between Stowman Law Firm & Lori Peterson Law Firm*, 855 N.W.2d 760, 761 (Minn. App. 2014), *aff'd* 870 N.W.2d 755 (Minn. Oct. 28, 2015). A finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Rogers v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999) (quotation omitted). Questions of law are reviewed de novo, but for a mixed question of fact and law, this court corrects erroneous applications of law but defers to the district court's ultimate conclusions, which are reviewed under an abuse of discretion standard. *Porch v. Gen'l Motors Acceptance Corp.*, 642 N.W.2d 473, 477 (Minn. App. 2002), *review denied* (Minn. June 26, 2002). We review the record in a court trial in the light most favorable to the district court's decision and defer to the district court's credibility determinations. Minn. R. Civ. P. 52.01; *Rogers*, 603 N.W.2d at 656.

## I.     Personal liability

WAF and Rupp challenge the district court's determination that WAF was not a legal entity when the lease was signed, and that it failed to operate as an LLC after it registered with the state. The district court noted that Rupp "freely and consistently spoke of [WAF] in terms personal to himself rather than as a limited liability company."

7

The district court concluded that WAF lacked standing to bring an action against Lowry and that Lowry had sustained its burden of proving that Rupp was personally liable on the lease.

An LLC, like a corporation, is a statutory creation. *See* Minn. Stat. §§ 322B.10; .105; .175 (2014); *see Stone v. Jetmar Props., LLC*, 733 N.W.2d 480, 485-86 (Minn. App. 2007) (rejecting de-facto corporation doctrine for both corporations and LLCs). An LLC comes into existence when the articles of organization are filed with the secretary of state. Minn. Stat. § 322B.175; *Stone*, 773 N.W.2d at 486. WAF did not exist on June 8, 2012, the date the lease was signed by Rupp.

As an equitable remedy, a court may find a corporation by estoppel; under this principle, for example, a mortgagor is estopped from denying the validity of a mortgagee's incorporation after obtaining an advantage by contracting with a mortgagee acting as a corporation. *Stone*, 733 N.W.2d at 487 (citing *N. Bldg. & Loan Ass'n v. Witherow*, 205 Minn. 413, 416-17, 286 N.W. 397, 398-99 (1939)). "[A] court may refuse to apply the doctrine of corporation-by-estoppel when the corporation is used to accomplish fraud." *Stone*, 733 N.W.2d at 488. Although no fraud claim was raised by Lowry here, the district court found that WAF (1) was not a legal entity at the time of the lease agreement; (2) failed to operate as one; (3) held no assets except for the lease agreement; (4) had no bank account, cash assets, or listed expenses; (5) did no annual accounting; and (6) filed no tax returns. WAF was, in fact, a meaningless, assetless shell against which Lowry had no recourse when the lease agreement failed. There are

8

sufficient facts in this record to support the district court's decision to refuse to apply the corporation-by-estoppel doctrine.

WAF argues that it ratified the lease agreement by signing the first amendment to the lease after it was formally organized, relying upon *Almac, Inc. v. JRH Dev., Inc.*, 391 N.W.2d 919, 924 (Minn. App. 1986), *review denied* (Minn. Oct. 17, 1986). *Almac* has been recognized as superseded by the corporation statute. *Stone*, 733 N.W.2d at 485. Similarly, other cases that WAF relies upon require a formal statement that the later-formed corporation agrees to be responsible and liable for earlier actions by promoters. *Whitney v. Wyman*, 101 U.S. 392, 396-397 (1879) (noting that corporation had ratified agreement as valid); *Norfolk S. Ry. Co. v. Jacobs*, 549 F. Supp. 2d 990, 999-1000 (N.D. Ohio 2008). In *Norfolk*, the district court concluded that the corporation accepted liability by signing a contract modification, similar to the situation here. *Id.* at 1000. But a valid corporation was in existence when the contract was signed and first modified; a subsequent modification was signed on behalf of a LLC that had not yet been formed. *Id.* at 999-1000. The district court concluded that the total sum of the parties' dealings demonstrated that they believed they were dealing with an LLC and that they did not intend to hold the individual responsible on the contract. *Id.* Here, Lowry and its principals acted as though they were dealing directly with Rupp, not with WAF.

Finally, Minn. Stat. § 322B.303 (2014) states that a member of an LLC is not personally liable for acts of the LLC, but "the conditions and circumstances under which the corporate veil of a corporation may be pierced under Minnesota law also appl[y] to limited liability companies." Minn. Stat. § 322B.303, subd. 2. Piercing the corporate

9

veil is an equitable remedy that may be applied when a party acts as the alter ego of a corporate entity. *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. App. 2009). This court reviews the district court's exercise of equitable powers for an abuse of discretion. *Id.* "When using the alter ego theory to pierce the corporate veil, courts look to the reality and not [the] form, with how the corporation operated and the individual defendant's relationship to that operation." *Id.* (quotation omitted). A court may consider whether the corporate entity (1) is insufficiently capitalized; (2) fails to observe corporate formalities; (3) is insolvent; (4) fails to maintain corporate records; or (5) exists as a mere façade for individual dealings. *Id.* If a court concludes that a corporate entity is an alter ego, a court may pierce the corporate veil if there is an element of injustice or fundamental unfairness. *Id.*

The court's findings here support a conclusion that WAF was a mere alter ego of Rupp. Based on this, the district court's conclusion that Rupp is personally liable to Lowry is not an abuse of discretion.

## II. Breach of contract

Rupp argues that the district court erred by concluding that he breached the lease contract and Lowry did not. "In order to state a claim for breach of contract, the plaintiff must show (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

10

"A condition precedent calls for the occurrence of an event before the contract becomes operative. An obligation then becomes dependent upon the performance or occurrence." *Metro. Sports Facilities Comm'n v. General Mills, Inc.*, 460 N.W.2d 625, 628 (Minn. App. 1990), *aff'd.* 470 N.W.2d 118 (Minn. 1991).

Rupp argues that Lowry failed to perform certain conditions precedent, including agreeing to the square footage and a floor plan, and failing to provide a "vanilla shell." Lowry counters that Rupp never provided plans and specifications, including a final concept of the type of restaurant, thus Lowry was never given the opportunity to approve the restaurant plan, and Rupp failed to obtain the necessary permits as required by the lease.

The district court found that (1) the parties never agreed to a square footage and Rupp disagreed with Lowry's calculation; (2) Rupp failed to provide plans and specifications for Lowry's approval until well after the last of the deadlines; (3) the plans Rupp provided were not sufficient to enable Lowry to approve them; and (4) Rupp never obtained government permits and was unable to do so because he never had plans with sufficient detail to obtain a permit. The district court made separate credibility findings, in which it found that Rupp was not a credible witness. Finally, the district court found "that Mr. Rupp's failure to perform was the result of his own failure to perform rather than [Lowry's] alleged failure to perform."

Because this is an appeal from a decision following a district court trial, this court defers to the district court's credibility determinations and reviews the record in the light most favorable to the decision. Minn. R. Civ. P. 52.01; *Rogers*, 603 N.W.2d at 656.

11

"The decision of a district court should not be reversed merely because the appellate court views the evidence differently." *Id.* There is sufficient evidence in the record to support the district court's findings, and the district court's legal conclusions based on those findings are not erroneous.

## III. Damages

Rupp argues that the district court's award of damages was excessive. The district court awarded Lowry $131,250 for unpaid rent from June 1, 2013 until trial and unpaid operating expenses in the amount of $114,317.76, which Rupp claims was excessive. The district court denied Rupp's motion for amended findings on the issue of damages.

Generally, the appellate court will not set aside a damage award unless "failure to do so would be shocking or would result in plain injustice." *Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn. 2008) (quotation omitted). An appellate court reviews the district court's determination of whether an award of damages is excessive for an abuse of discretion. *Dallum v. Farmers Union Cent. Exch., Inc.*, 462 N.W.2d 608, 614 (Minn. App. 1990), *review denied* (Minn. Jan. 14, 1991).

The plaintiff has the burden of proving the amount of compensatory damages to a reasonable probability. *Poppler v. Wright Hennepin Coop Elec. Ass'n*, 834 N.W.2d 527, 546 (Minn. App. 2013), *aff'd*, 845 N.W.2d 168 (Minn. 2014). A plaintiff may not recover remote, speculative, or conjectural damages, but "[o]nce the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount." *Id.* (quotation omitted).

Under the terms of the lease, Rupp was required to pay a proportionate share of the building operating expenses as additional rent, commencing June 1, 2013. According to the lease, "[t]he factor to be used to determine [Rupp's] share of the Lessor's Operating Expenses attributable to the Premises shall be mutually agreed upon based upon the type of premises consistent with standard commercial lease terms." The lease defined "operating expenses" to include "all expenses attributable to the [restaurant premises]" and would include taxes, governmental charges, insurance, electricity, gas, telephone, heat, water, sewer, pest control, trash disposal, snow removal, and "repair, maintenance, replacement and preservation of all structural and other incidental parts of the Property."

Kortgard testified that she used Rupp's architect's estimate of the square footage for the restaurant premises. The square footage equaled 19.3-19.4 percent of the total building area. She used the actual building expenses incurred during 2013, and calculated that Rupp owed $114,317.76 in operating expenses and real-estate taxes.

Rupp argues that there is no basis for this calculation because the lease stated that he and Lowry had to agree on the method for calculating expenses. Rupp describes this as "an agreement to agree" and argues that this is unenforceable. Further, Rupp asserts that a percentage share of the total building expenses is unreasonable because it includes rooftop areas that would not be heated or cooled.

In a series of e-mail exchanges offered into evidence at trial, Crockarell and Rupp discussed the square footage. Crockarell described the restaurant square footage as 19.4% of the total based on Duffy's estimates; Rupp did not agree but said "the areas are

13

what they are so I suspect we will agree on the measurements." Rupp argued that the operating expenses should be lower for the lobby and the outside roof. Crockarell stated that they "have agreed that [operating] expenses should be around $650,000." Rupp asked where that number came from and Crockarell replied that "[t]his is the estimate [that] you suggested." The disputes continue through the entire e-mail exchange; clearly, the parties viewed the contract terms differently.

Although the lease required Rupp and Lowry to agree on a method for determining operating expenses, it also clearly contemplated that operating expenses were a part of the rental payment. "[A]n award of damages will not be denied merely because of difficulty in ascertaining them, and absolute certainty is not required." *Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 653 (Minn. 1986) (citation omitted). "There is no general test for speculative or conjectural damages; such matters should usually be left to the judgment of the trial court." *Id.*

The lease specified that Rupp would be responsible for all operating expenses associated with the restaurant premises, and Lowry presented a reasonable method for calculating them based on the proposed square footage and actual building expenses. This is a reasonable basis for a damage calculation that does not result in an unjust or shocking award, and we decline to set it aside. *See Dunn*, 745 N.W.2d at 555.

## IV. Attorney fees

Rupp argues that the district court erred by reforming the contract to allow an attorney fee award. The district court found that

14

[Lowry] requests an award of attorney fees under paragraph 11(e) of the lease, which states: "In the event of a default by the Lessor . . . hereunder, the Lessee . . . may pursue any right or remedy to which it is entitled under the law and in such event Lessor may recover its reasonable attorney's fees and costs in pursuing such right or remedy."

The district court made the following conclusions of law based on this finding:

8. With regard to Defendant's request for an award of attorney fees, the lease provision that provides for such relief, paragraph 11(e), lacks clarity. As written, it states that "*in the event* of a default by *Lessor,*" the "*Lessee* may pursue any right or remedy to which it is entitled under the law" and "*in such event Lessor* may recover its reasonable attorney's fees and costs in pursuing such right or remedy." As written, the provision allows Plaintiff lessee to pursue a remedy and, for the same event, i.e., the lessor's default, allows lessor to seek its attorney fees.

9. A court in interpreting a contract is to give effect to the intentions of the parties. Language that allows the lessor to seek attorney fees for its own default is illogical and suggests a language error. None of the parties argue that the fee provision as stated represented a negotiated term. In fact, Mr. Rupp testified that he did not read many of the closing documents he was asked to sign.

10. All other provisions under section 11 provide protection for the lessor against a variety of adverse events. In that larger context, it would be reasonable to expect that paragraph 11 would do the same, absent clear evidence of a contrary intent. Given all available information, it is most reasonable to conclude that the words "lessor" and "lessee" were mistakenly transposed and that the provision should have read as follows.

In the event of a default by the *Lessee* hereunder, the *Lessor* may pursue any right or remedy to which it is entitled under the law and in such event Lessor may recover its reasonable attorney's fees and costs in pursuing such right or remedy. [Emphasis added.]

15

> 11.     Given this court's interpretation of paragraph 11(e), Defendant Lowry Building LLC is entitled to recover its attorney fees and costs against Third-Party Defendant John R. Rupp, individually. This court will retain jurisdiction to consider Lowry Building LLC's application for attorneys' fees pursuant to Rule 119 of the Minnesota General Rules of Practice.

At trial, Rupp testified that (1) the lease was "ambiguous" as to which party is entitled to attorney fees; (2) the attorney fees provision "doesn't make any sense in the way it's written"; and (3) "there's a typo on Lessor in the third line, which should read Lessee" and one should substitute "lessee" for "lessor" for it to make sense. Rupp stated he read the lease the day of closing and would have amended that subdivision if he had noticed it.

Kortgard testified on behalf of Lowry that "[o]ur intent was that the tenant would be responsible for attorney[ ] fees, if they were in default" and that this would be the common practice in Lowry's real estate dealing.

Rupp analyzes the district court's conclusion as a reformation of a written agreement. A court may reform a written agreement when parties have reached an agreement and reduced it to writing, but fail to express the agreement correctly. *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 779 N.W.2d 865, 870 (Minn. App. 2010) (quotation omitted), *aff'd*, 795 N.W.2d 855 (Minn. 2011). But the parties must agree both that there is a mutual mistake and that they agree as to the proper content of the document. *Id.* Here, the parties agree there is a mistake, but do not agree as to proper language, so reformation on the basis of mutual mistake is not applicable.

16

Both parties agree that the clause as written is not correct: Rupp testified that it was ambiguous and made no sense, and Kortgard testified that it was simply wrong as written. The interpretation of an ambiguous contract is a question of fact for the factfinder. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003). But the question of whether a contract is ambiguous is a question of law subject to de novo review. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 832 (Minn. 2012).

A contract is ambiguous if it is susceptible to more than one interpretation. *Id.* "[C]ontract language must be given its plain and ordinary meaning, and shall be enforced by [the] courts even if the result is harsh." *Denelsbeck*, 666 N.W.2d at 347 (quotation omitted). "The primary goal of contract interpretation is to determine and enforce the intent of the parties." *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

Here, the parties argue for different interpretations of the attorney-fees paragraph. Rupp asserts that clearly it creates a remedy for the lessee and argues that the final sentence of the clause should give the lessee the right to recover attorney fees. Lowry argues that the clause follows the preceding paragraphs in laying out remedies for the lessor, and that "lessor" and "lessee" are transposed at the beginning of the paragraph. The evidence supports two reasonable interpretations, and, thus, the contract is ambiguous. *See Toyota-Lift of Minn., Inc. v. Am. Warehouse Sys., LLC*, 868 N.W.2d 689, 695 (Minn. App. 2015) (stating that "[t]he determination of whether a contract is ambiguous depends on the meaning assigned to the words and phrases in accordance with the apparent purpose of the contract as a whole"), *aff'd*, ___ N.W.2d ___ (Minn. 2016).

The district court considered matters outside the language of the contract and concluded that Lowry's interpretation was more logical because the attorney-fee clause is contained in a section that dealt with the lessor's rights in various situations. *See Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010) (stating that courts may consider parol evidence to determine parties' intent when contract language is ambiguous). The court noted that Rupp admitted he had "not read many of the closing documents he was asked to sign" and "[n]one of the parties argue that the fee provision as stated represented a negotiated term." Other findings suggest that the district court did not find Rupp to be credible. The record evidence supports the district court's contract interpretation. *See Rogers*, 603 N.W.2d at 656 (stating that appellate court will not substitute its judgment for district court's decision if it is supported by record).

**Affirmed.**